**In the Matter of the Honorable David P. BUCKSON, a Judicial Officer.**

Delaware Court on the Judiciary.

Submitted: April 29, 1992.
Decided by Order: April 30, 1992.
Opinion: July 7, 1992.

Thomas Herlihy, III, Herlihy, Harker & Kavanaugh, Wilmington, for respondent.

Howard M. Handelman, Bayard Handelman & Murdoch, Wilmington, appointed as Presenter.

Before VEASEY, C.J., HORSEY, MOORE, WALSH, and HOLLAND, JJ., ALLEN, Chancellor, and RIDGELY, President Judge, constituting the Court on the Judiciary.

VEASEY, Chief Justice:

■ This matter is before the Court on the Judiciary (the "Court"), for determination of several issues arising out of charges of alleged misconduct filed against the respondent, the Honorable David P. Buckson, an Associate Judge of the Family Court of the State of Delaware ("Judge Buckson" or "respondent"). The conduct in question involves political activities of Judge Buckson in his attempt, without first resigning his judicial office, to seek the endorsement of his party convention for the nomination for the office of Governor of the State of Delaware. Respondent has been an Associate Judge of the Family Court of the State of Delaware for Kent County since May 1975. Although his 12-year term has expired, he has held that office in hold-over status pending action by the Senate on a gubernatorial nomination to fill the office presently held by him.[1]

The Preliminary Investigatory Committee (the "Committee") of the Court found, on April 6, 1992, pursuant to Rule 3(b) of the Rules of the Court on the Judiciary ("Ct.Jud.R."), that the Court has jurisdiction in the matter and found probable cause to believe that respondent may be subject to censure, suspension, removal, or retirement under Article IV Section 37 of the Delaware Constitution. Thereupon, the Court entered an order on April 7, 1992 (the "April 7 Order"), appointing Vice Chancellor William B. Chandler, III as the Board of Examining Officer (the "Board"), pursuant to Ct.Jud.R. 5(a). The Board held an evidentiary hearing on April 14, 1992, and issued its Final Report on April 21, 1992 (the "Final Report"). Respondent had notice and an opportunity to be heard before both the Committee and the Board, but he chose not to attend and was not represented by counsel before the Committee or at the evidentiary hearing before the Board.[2] The record now before the Court includes the testimony, exhibits, and other proceedings before the Board as set forth in the transcript of the April 14, 1992, hearing (the "Hearing Transcript").

The Board in its Final Report found that the clear and convincing evidence [3] showed

---

1. Such hold-over status is a phenomenon of Delaware statutory judgeships, such as those of the Family Court. Del. Const. Art. XV § 5. Constitutional judgeships (such as those of the Supreme Court, Court of Chancery, and Superior Court) do not hold over, except to the extent that judges of constitutional courts continue to hold office for 60 days following expiration of their terms or until their successors are confirmed and take the oath of office. Del. Const. Art. IV § 3. Notwithstanding the fact that certain judges of statutory courts, such as respondent, are continuing to hold office as hold-overs, such judges are *de jure* judges, and hold office with legitimacy equal to that of judges of the same court whose terms have not expired. *Barron v. Kleinman,* Del.Supr., 550 A.2d 324 (1988). Also, a hold-over judge is bound by the Delaware Judges' Code of Judicial Conduct and is subject to the jurisdiction of the Court on the Judiciary under Article IV Section 37 of the Delaware Constitution.

2. Thomas Herlihy, III, Esquire was (conditionally) appointed by order of the Court dated April

21, 1992 (the "April 21 Order") to represent Judge Buckson pursuant to respondent's April 20, 1992, petition requesting such appointment. Although respondent was not represented by counsel at the hearing before the Board, he was represented by counsel before the Board proceedings were final. Such counsel filed comprehensive objections to the Board's draft report, which objections were considered by the Board before issuance of its Final Report. The April 21 Order also appointed Howard M. Handelman, Esquire ("Presenter") to uphold the Final Report in proceedings before the Court. Mr. Handelman was appointed by the Board, in its Order of April 8, 1992, as the Presenter before the Board. The conditional nature of Mr. Herlihy's appointment related to the fact that such appointment did not establish any entitlement to compensation at public expense. *See* April 21 Order, page 3, paragraph 4.

3. The Rules of the Court on the Judiciary require that "facts justifying action shall be established by clear and convincing evidence." Ct. Jud.R. 7(f).

that Judge Buckson's activities made him a candidate for non-judicial office and that such activities constituted intentional violations of Canons 1, 7A(2), 7A(3) and 7C of the Delaware Judges' Code of Judicial Conduct (the "Code").[4] The Board concluded that respondent should be removed from office, publicly censured for his actions, and ordered to return all monies received by him from the State as a judicial officer from March 31, 1992, until the date of his removal. The Board rejected respondent's contention that he was denied procedural due process.

After briefing and oral argument by counsel for respondent and the Presenter, a unanimous decision was announced by this Court on April 30, 1992, which decision is set forth in the Order entered at 12:00 noon EDT on that date (the "April 30 Order") (attached hereto as Appendix A). *See* Ct. Jud.R. 9(c)(5). This is the formal Opinion of the Court, more fully explicating the issues decided in the April 30 Order.

The Court in its April 30 Order found that the record establishes by clear and convincing evidence that respondent intentionally violated Canons 1, 7A(2), 7A(3), and 7C of the Code and that such misconduct was "persistent" and "wilful" as proscribed by Article IV Section 37 of the Delaware Constitution. The Court ordered that respondent be removed from office and cease all judicial activities as of noon April 30, 1992. The Court found that respondent's continuing misconduct was unethical, deplorable, and irresponsible. The Court further found that respondent's behavior was demeaning of a judicial office in that it failed to observe and maintain the high standards of conduct required so that the integrity and independence of the judiciary may be preserved. Accordingly, respondent was publicly censured. The

Court did not, however, find that there was clear and convincing evidence to support any forfeiture, including restoration of monies paid to respondent from March 31, 1992, to the date of the April 30 Order.

## I. THE APPLICABLE PROVISIONS OF THE CODE, THE CONSTITUTION, AND THE RULES OF COURT

The central issue on the merits involves the proper interpretation and application of Canons 1 and 7 of the Code,[5] which provisions state, in pertinent part, as follows:

### CANON 1

**A Judge Should Uphold the Integrity and Independence of the Judiciary**

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

### CANON 7

**A Judge Should Refrain from Political Activity Inappropriate to His Judicial Office**

A. A judge should not:

\* \* \* \* \* \*

(2) Make speeches for a political organization or candidate or publicly endorse a candidate for public office;

(3) Solicit funds for or pay an assessment or make a contribution to a political organization or candidate, attend

---

4. The Final Report concluded that the Board could not find that Judge Buckson violated Canon 7B because he "is not a candidate in a party primary since no party primary has occurred or is occurring." Final Report pp. 13–14. Canon 7B provides, in pertinent part as follows:

 B. A judge should resign his office when he becomes a candidate either in a party primary or in a general election for a nonjudicial office. . . .

5. The Code was adopted by the Delaware Supreme Court in 1974 and is currently applicable. The American Bar Association adopted in 1990 a new Model Code of Judicial Conduct (the "ABA Model Code"). The ABA Model Code is under consideration by a committee appointed by the Delaware Supreme Court.

political gatherings, or purchase tickets for political party dinners, or other functions;

\* \* \* \* \* \*

C. A judge should not engage in any other political activity except on behalf of measures to improve the law, the legal system or the administration of justice.

The authority and mechanism for determining whether or not a judge has violated the Code and the sanctions for any such violation are established in Article IV, Section 37 of the Delaware Constitution. That section provides, in pertinent part, as follows:

### § 37. Court on the Judiciary.

Section 37. A court on the Judiciary is hereby created consisting of the Chief Justice and the Associate Justices of the Supreme Court, the Chancellor, and the President Judge of the Superior Court.

Any judicial officer appointed by the Governor may be censured or removed or retired by the Court on the Judiciary as herein provided.

A judicial officer may be censured or removed by virtue of this section for wilful misconduct in office, wilful and persistent failure to perform his duties, the commission after appointment of an offense involving moral turpitude, or other persistent misconduct in violation of the Canons of Judicial Ethics as adopted by the Delaware Supreme Court from time to time. . . .

No judicial officer shall be censured or removed or retired under this section unless he has been served with a written statement of the charges against him, or of the grounds of his retirement, and shall have had an opportunity to be heard in accordance with due process of law. The affirmative concurrence of not less than two-thirds of the members of the Court on the Judiciary shall be necessary for the censure or removal or retirement of a judicial officer. The Court on the Judiciary shall be convened for ap-

propriate action upon the order of the Chief Justice, or upon the order of any other three members of the Court on the Judiciary. All hearings and other proceedings of the Court on the Judiciary shall be private, and all records except a final order of removal or retirement shall be confidential, unless the judicial officer involved shall otherwise request.

Upon an order of removal, the judicial officer shall thereby be removed from office, all of his authority, rights and privileges as a judicial officer shall cease from the date of the order, and a vacancy shall be deemed to exist as of that date. . . .

The Court on the Judiciary shall have:

\* \* \* \* \* \*

(b) the power to adopt rules establishing procedures for the investigation and trial of a judicial officer hereunder.

The Court has adopted rules which provide certain procedures and time periods within which the Committee, the Board, and the Court are required to perform their respective functions. *See, e.g.,* the following Rules of the Court: Rule 3(d)(2) (Committee shall determine jurisdiction within 20 days); Rule 3(d)(4) (pursuant to Supreme Court Rule ("Supr.Ct.R.") 68(a) counsel will not be appointed for a judicial officer at state expense; failure of judicial officer to answer complaint within 15 days deemed to be admission);[6] Rule 3(d)(5) (Committee shall file its written report within 40 days of docketing complaint); Rule 6(b) (hearing before the Board to be held at earliest practicable time, not later than 60 days after appointment of the Board, and Board's order to show cause shall be served on respondent at least 40 days before hearing date); Rule 6(c) (respondent shall file answer to order to show cause within 15 days); Rule 7(d) (respondent must be represented by counsel before the Board and if he is not represented by counsel of his choice, the Board shall appoint counsel to represent him at all

---

6. Under Supr.Ct.R. 68(a), an application for appointment of counsel for a judicial officer in a proceeding before the Court on the Judiciary is not ripe until the Court has appointed an Examining Board under Ct.Jud.R. 5.

stages of the proceedings before it); Rule 7(e) (respondent shall file praecipes for subpoenas at least five days before hearing date); Rule 8(a), (b) and (c) (Board to prepare draft report at the earliest practicable time but not later than 30 days after final hearing, and during the ten day period after service of that draft report respondent may file objections); Rule 9(c)(2) (respondent may file exceptions to Board's final report within ten days after the report filed with the Court); and Rule 9(c)(5) (Court shall file written opinion and order at earliest practicable time deciding disposition of charges against respondent).

Notwithstanding such provisions, Rule 10(f) provides that time periods may be extended by the Chief Justice upon motion for good cause shown, and Rule 10(i) provides that any rule may be suspended for a specific case by special order of the Court. Rule 10(i) was specifically invoked by the Court in various orders which shortened substantially several of the time periods.[7] The need to expedite the proceedings was found to exist because, *inter alia:* the political activity in question had commenced on or about March 30, 1992; that activity was continuing; and Judge Buckson stated that he intended to pursue his candidacy to the Republican State Convention on May 9, 1992. His limited response to these proceedings was to tender to the Governor a letter of resignation of his judicial office. The letter was dated April 13, 1992, but not effective until midnight April 30, 1992.

## II. PROCEDURAL HISTORY

This proceeding commenced on April 1, 1992, with the filing of a complaint in this Court by the Honorable Vincent J. Poppiti, Chief Judge of the Family Court of the State of Delaware. Pursuant to Section 37 of the Delaware Constitution, the complaint and all subsequent proceedings were cloaked with confidentiality and remained so until April 22, 1992, when respondent waived confidentiality.[8] The complaint asserts that respondent violated various provisions of Canon 1 and Canon 7 of the Code. The complaint recited the fact that respondent, on or about March 30, 1992, publicly announced in a press release attached to the complaint that it was his "intent to have my name placed before the Republican Convention to be the gubernatorial nominee for Governor of Delaware. The party deserves a choice." The respondent went on to state in that press release the following:

> This is not partisan politics and, therefore, not in violation of any rules pertaining to the judiciary. When I am the nominee, I will resign my present position and ask the Governor to promptly name a successor acceptable to the Senate.
>
> Based upon the contacts by many people since my November announcement, I have statewide support. My plan is to attend functions of many of the Republican Party organizations to gain delegates to the convention by presenting my qualifications, ...
>
> \* \* \* \* \* \*
>
> Based upon my experience in state government, I am eminently qualified to be Governor of Delaware ... certainly more so than any person mentioned for the office to date.

---

7. While Rule 10(f) requires "good cause" to enlarge the time periods, Rule 10(i) does not require "good cause" to suspend the rules. Nevertheless, the recitals in the applicable orders of the Court in this matter set forth facts which establish that good cause existed. *See, e.g.,* April 1, 7, 21, and 23 Orders.

8. Under Article IV § 37 of the Constitution and Ct.Jud.R. 10(d), all records and proceedings, *except a final* order of removal or retirement, are confidential "unless the Court shall otherwise order on request of the judicial officer involved." Since respondent had released selected material to the news media, the Court inquired whether respondent was waiving confidentiality. After some initial confusion in which counsel for respondent initially advised that confidentiality would not be waived, respondent on April 22, 1992, finally delivered a handwritten note to the Clerk of the Court waiving confidentiality. The Court thereupon entered an order on April 22, 1992 (the "April 22 Order") releasing the proceedings from the confidentiality requirement.

So ..... on to the convention! Thanks,

David P. Buckson

Also on April 1, 1992, Chief Judge Poppiti, acting pursuant to the administrative authority of 10 *Del.C.* § 908(1) and (7), in a private and confidential communication, directed respondent as follows (to which respondent the next day provided handwritten responses as noted in bold and italicized type):

1) You shall not hear or decide any judicial matters or act in any judicial capacity whatsoever until the propriety of your political activity has been resolved;

 *Agreed. DPB. Was done before receiving your directive.*

2) You shall either immediately publicly retract your declaration of your intention to seek political office together with a statement that as long as you remain a Family Court Judge you will not actively seek political office or engage in political activities of any nature *or* that you resign or retire forthwith from the Family Court; and

 *Disagree. DPB.*

3) You shall deliver to me a detailed written response to each of these directives not later than Thursday, April 2, 1992, at 12:00 noon.

 *Agree to date & time. DPB.*

On the same day, this Court entered an order dated April 1, 1992, signed by Senior Justice Henry R. Horsey as Acting Chief Justice, pursuant to Article IV Section 13 of the Delaware Constitution, in view of the then vacancy in that office (the "April 1 Order"). The April 1 Order called for expedited proceedings by providing *inter alia,* as follows:

\* \* \* \* \* \*

4) *Because the apparent political activities of Judge Buckson are intended to secure him the nomination of a political office by May 9, 1992, Justice Horsey has also concluded that it is necessary to recommend the entry of a special expedited order in this case, suspending and superseding the Rules which provide time periods for action by the Preliminary Investigatory Committee.*

5) The Court has determined that a special expedited order should be entered in this specific case. Ct.Jud.R. 10(i).

NOW, THEREFORE, pursuant to Rule 10(i), IT IS HEREBY ORDERED that the times set forth in Rule 3(d)(2) and (5) are suspended in this specific case and superseded....

(Emphasis supplied.) This Order then set forth a schedule requiring the Committee to act by April 6, 1992. The Order was personally served on respondent's wife on April 1, 1992 at 6:30 p.m.

The following day, April 2, 1992, the Committee notified respondent by letter of the same date, that it was providing him with an opportunity to appear and be heard on the complaint on April 6, 1992, a closed hearing to be held at Courtroom No. 2 of the Kent County Courthouse in Dover, a short distance from respondent's home. Respondent elected not to appear. Instead, respondent sent to the Committee a handwritten notation on its April 2 letter as follows:

To: Panel Members

From: David P. Buckson

I respectfully decline to attend.

The person who selected the time, place & date for the hearing is either out of touch with reality or wants the meeting publicized. I prefer to believe the former.

My appearance at Kent Co Ct. house with 3 strangers at 10: am on a Monday morning would result in an influx of news media.

Holding a confidential meeting in a courtroom in Kent Co. is not acceptable to me. Therefore, I will not attend.

I will reply in the required time when I receive your decision.

Respectfully,
David P. Buckson
4 Apr. 92

On April 6, 1992, the Committee concluded the Court has jurisdiction, finding as follows:

The facts found by the Committee establish *prima facie* that Judge Buckson is engaged in political activity inappropriate to his judicial office and in violation of Article IV, § 37 of the Delaware Constitution.

Committee Report, April 6, 1992, at p. 4.

Thereupon, the Court entered an order on April 7, 1992 ("April 7 Order"), signed by the Chief Justice,[9] which order provided, *inter alia:*

(3) Respondent has previously publicly announced his intention to seek the nomination of his party for the office of Governor of the State of Delaware and has stated that he intends to hereafter engage in political activity preliminary to the State convention of his party on May 9, 1992. Contrary to the directive of April 1, 1992, the respondent has refused to retire or resign from the Family Court before pursuing his political objectives, and it appears that he is actively attending political functions as a Family Court Judge while seeking political office. *Thus, the Court on the Judiciary is required to expedite the matter in view of respondent's activities and his May 9 objectives.*

(4) Pursuant to Rule 5(a), the Court is required to appoint a Board of one or more Examining Officers (hereafter "Board") to carry out the duties of the Board, as set forth in the Rules. *Respondent thereupon is entitled under Supreme Court Rule 68(a) to apply for appointment of counsel. If respondent desires to seek appointment of counsel, the Board shall require him to inform the Board on or before April 10, 1992 of his intention to invoke Supreme Court Rule 68, and respondent shall thereupon be required to immediately file his petition with the Board, pursuant to Supreme Court Rule 68(c).*

(5) *Pursuant to this Court's Order dated April 1, 1992, paragraphs (4) and (5), and Ct.Jud.R. 10(i), the time requirements of Rules 6, 7 and 8 are also* *suspended and superseded* in the following respects: (i) the Board is directed to file its final report as promptly as practicable and, consistent with the interests of justice, and no later than Monday, April 20, 1992 at 4:00 p.m.; (ii) the Board shall issue and serve upon respondent, pursuant to Ct.Jud.R. 6(b), its Order to Show Cause within three days of the date of this Order which order shall designate the time, date and place of the Board's hearing; (iii) respondent shall file with the Clerk, pursuant to Ct.Jud.R. 7(e), any praecipes for the issuance of subpoenas and the production of books and documents at least three days prior to the time of the Board's scheduled hearing; (iv) pursuant to Ct.Jud.R. 8(a), the report of the Board shall include any findings of fact, conclusions of law, and recommendations of relief, *pendente* or final, which the Board deems appropriate in the circumstances; and (v) within three days of the date of the issuance and service of the Board's draft report and respondent's receipt of a transcript of the Board's hearing, respondent may file with the Board any statement or objection to the draft report.

(Emphasis supplied.)

By its order dated April 8, 1992, the Board issued an Order to Show Cause to respondent, directing him to appear on April 14, 1992, at the Supreme Court Hearing Room in Wilmington, and to show cause before the Board why he should not be censured, suspended, removed, or retired. The Order to Show Cause also provided:

Your attention is specifically directed to Ct.Jud.R. 7(d) which provides that a respondent "must be represented by counsel and if he is not represented by counsel of his choice, the Board shall appoint counsel to represent him at all stages of the proceedings before it," together with the provisions of Supreme Court Rule 68 authorizing appointment of private counsel for public officers of

---

**9.** On April 7, 1992, E. Norman Veasey was sworn in as Chief Justice of the Delaware Supreme Court and thereby became a member and the presiding officer of the Court on the Judiciary.

the State in certain defined circumstances.

*Further, in accordance with the April 7, 1992, Order of the Court on the Judiciary, you shall advise the Board on or before 4:00 p.m., Friday, April 10, 1992, of your intention to invoke Supreme Court Rule 68 and you shall immediately file your petition with the Board pursuant to Supreme Court Rule 68(c).*

Pursuant to Ct.Jud.R. 6(c) and the April 7, 1992, Order of the Court on the Judiciary, respondent shall file with the Board an answer to this Order on or before 4:30 p.m. Monday, April 13, 1992.

(Emphasis supplied.)

On April 13, 1992, the day before the scheduled Board hearing, respondent called Vice Chancellor Chandler on the telephone and informed the Board that respondent did not intend to appear, but meant no disrespect. There ensued a discussion of respondent's attempt to obtain counsel. Respondent also left a message on April 14, 1992, with a secretary at the Supreme Court Chambers five minutes before the hearing before the Board was scheduled to commence. In that message, respondent informed the Board that he did· not yet have counsel, but he intended to obtain counsel. Respondent elected not to appear before the Board, in person or by counsel. The hearing before the Board proceeded. The Board made a record of the various conversations with respondent [10] and proceeded to receive evidence offered by the Presenter.

Also on April 13, 1992, respondent sent a handwritten letter to Governor Castle [11] stating as follows:

To: Governor Castle

Please be informed that I am retiring effective last minute of the last day of April 1992.

David P. Buckson
April 13, 1992

On April 15, 1992, the Board sent its draft report to respondent. On April 20, 1992, the day the Board's Final Report was due to be filed in this Court, Thomas Herlihy, III, Esquire, advised the Court that he had been asked by respondent to represent him, that there would be a petition for his appointment under Supr.Ct.R. 68, and that a 24–hour extension of the April 20 due date for the Final Report of the Board was requested in order to permit him, on behalf of respondent, to submit to the Board exceptions to the Board's draft report. In its Order of April 20, 1992, the Court acceded to the request, and specifically noted as follows:

3. Such counsel has been orally advised by the Court that his request would be granted, but that if further proceedings of the Court are necessitated after the filing of the final report of the Board, that such proceedings would be expedited.

Later in the day on April 20, respondent filed a petition under Supr.Ct.R. 68 for the appointment of Mr. Herlihy as counsel for respondent. The petition recognized in paragraph 6 that it was not timely filed:

6. Petitioner has been unable to file this Petition within ten days after service of the Complaint because Petitioner has had difficulties obtaining an attorney who would represent him and therefore asks that the Court enlarge the time for the consideration of this Petition.

By order dated April 21, 1992 (the "April 21 Order"), the Court conditionally granted respondent's petition because of the exigency of the matter and despite certain deficiencies in the petition. The April 21 Order provided, *inter alia,* as follows:

(6) Because of the expedited nature of these proceedings, the Court has conditionally granted respondent's petition under Rule 68 notwithstanding the following: (i) such petition was not timely filed pursuant to paragraph 4 of this Court's Order of April 7, 1992; (ii) the petition on

---

10. The recitation of these conversations is set forth at pp. 2–7 of the transcript of the April 14, 1992, proceedings before the Board.

11. Respondent also sent a handwritten letter that same day to Chief Judge Poppiti informing him of his resignation effective at the end of the day on April 30, 1992, and stating that he "[w]ill be on vacation until that date."

its face is deficient in the failure to allege "facts supporting petitioner's claim that the action against him arises out of his employment with the State" as required by Sup.Ct.R. 68(a)(4); (iii) the opposition of the Attorney General and the Presenter; (iv) serious and unresolved concerns regarding the issue of the ultimate entitlement of appointed counsel for respondent to be compensated or reimbursed at State expense, which concerns arise, *inter alia*, from the provisions of Sup.Ct.R. 68, Ct.Jud.R. 7(d), 10 *Del.C.* § 3925, and 29 *Del.C.* § 2507. Counsel for respondent was orally advised at 2:00 p.m. on April 21, 1992, of the action of the Court on the petition under Sup.Ct.R. 68, which action is set forth below.

\* \* \* \* \* \*

NOW, THEREFORE, IT IS ORDERED that ...
(4) Thomas Herlihy, III is hereby appointed as counsel for respondent, but such appointment is conditional in that: (i) the expedited nature of this proceeding requires that he be empowered to act as counsel for respondent within the time limitations established; (ii) no determination is made or implied that such counsel is entitled to any compensation or reimbursement of expenses at State expense; and (iii) it is expressly understood that, if respondent and his appointed counsel elect to proceed, it shall be on such conditional basis.

### III. THE FINAL REPORT OF THE BOARD

The Final Report recites the procedural history, much of which is set forth herein. The Board also summarized the evidence submitted before the Board and made findings of fact.

A. *Findings Of Fact By The Board*

On March 30, 1992, respondent held a news conference, which was publicized the next day in the Wilmington paper, *The News Journal.* According to the newspaper article, respondent stated he was seeking the Republican Party's endorsement for Governor, he had already made a number of speeches, and he intended to make additional speeches before a variety of party groups, such as representative district and county committees, in support of his candidacy.

In conjunction with the press conference, respondent issued a written press release captioned "Political Plans Of David P. Buckson From His Home In Camden, Delaware." The written release stated "Today I officially announce my intent to have my name placed before the Republican Convention to be the gubernatorial nominee for Governor of Delaware."

On March 31, 1992, the day of the publication of the first news article, respondent was contacted by Justice Horsey, as Acting Chief Justice. In that conversation, respondent acknowledged and confirmed to Justice Horsey the accuracy and correctness of the statements attributed to him in the news article. Respondent also acknowledged that the news article fairly reflected what he informed the news media.

Respondent's political activities were reported several times a week in *The News Journal* and the *Delaware State News.* Often those articles included statements from respondent regarding his political activities to obtain the Republican Party's nomination. On April 9, 1992, respondent held a second press conference. It was held outside the New Castle County Airport Terminal and was attended by reporters, a photographer, and a television cameraman. Respondent sat at a card table in front of a recreational vehicle decorated with a sign: "Common Sense For Delaware/David Buckson Governor '92." During the press conference respondent reiterated that he desired to become Governor and that he did not intend to retire before his replacement had been confirmed. He also stated that he had stopped hearing Family Court cases.

In November 1991, respondent had notified Basil R. Battaglia, the Delaware Chairman of the Republican Party, that he was intending to gain the Republican nomination for the office of Governor for the State

of Delaware. Mr. Battaglia also testified that respondent attended political functions, where respondent repeated his desire to gain the nomination. One such Republican gathering was held on March 30, 1992, where respondent addressed his positions on issues that were important to him as a candidate for the office of Governor. Mr. Battaglia also testified that on April 6, 1992, at a Colonial region caucus [12] respondent approached him and reaffirmed his desire for the Party's nomination. Battaglia also testified that respondent attended a Kent County region caucus on April 8, 1992, and a Brandywine region caucus on April 13, 1992, where he wore a pin that said "Buckson for Governor." At this latter meeting, respondent was introduced as a judge and spoke as a judge who was a candidate for Governor.

James T. Glessner, administrator of the Family Court for the State of Delaware, testified that on March 19, 1992, respondent addressed Family Court employees at an employee awards luncheon in the Kent County Family Court Building and said that he was seeking the Republican nomination for Governor and would retire if he gained that nomination.

On April 1, 1992, Chief Judge Poppiti wrote to respondent summarizing an earlier conversation that the two had held over the phone, and ordered that respondent cease and desist from acting in any judicial capacity whatsoever until the resolution of the issue of his political activities.[13] On that same day, Chief Judge Poppiti filed the complaint with the Court.

### B. The Board's Conclusions As To Due Process

The Board noted that respondent raised a number of arguments claiming that these proceedings have failed to comport with due process because of lack of notice and an adequate opportunity to be heard, and

the lack of authority for Chief Judge Poppiti's April 1 Order.

The Board found that respondent was timely served with the complaint, the Orders of the Court, the Report of the Committee, and the Board's Order to Show Cause dated April 8, 1992. The Board concluded that respondent's arguments as to notice really are arguments that he had not received a meaningful opportunity to be heard, and found that the proceedings did not violate respondent's due process rights because of a failure of notice.

Respondent argued to the Board that he had not received an adequate opportunity to be heard at a meaningful time and in a meaningful manner because: the time periods for his responses to various proceedings were shortened by various orders; the Committee held their hearing in the Kent County Courthouse on a Monday at 10:00 a.m.; and he was not represented by counsel during the proceedings.

The Board found that respondent had an opportunity to defend himself at various stages of this proceeding, but that respondent had declined an opportunity to appear and be heard at the Committee hearing on April 6 and at the Board hearing on April 14.

The Board found that Ct.Jud.R. 10(i) specifically provides that the Court may suspend any of its rules, including the rules as to the timing of responses and hearings, and that the shortened time periods provided sufficient time for respondent adequately to defend himself. The Board concluded that the Court's suspension of its rules and the imposition of the shortened time periods did not play a part in determining the outcome of the proceedings.

Respondent also argued in his objections to the Board's draft report that the Committee's hearing at the Kent County Courthouse on Monday, April 6, 1992, did not provide him a meaningful opportunity to be

12. According to Mr. Battaglia, a caucus is a political gathering where members of a political party select delegates to a nominating convention, who eventually nominate candidate(s) for an office on behalf of the party. Final Report at p. 2 n. 2.

13. Respondent agreed to abide by this Order in his response to Judge Poppiti's April 1, 1992 letter, but respondent refused to resign from his office or to retract his declaration of his intention to seek political office as Chief Judge Poppiti's April 1 letter also had ordered.

heard since the hearing would impinge on his right to confidentiality. The Board found, however, there was no evidence that the hearing would be open to the public or that the public was told by the Court of the time and place of the hearing. Therefore, the Board concluded that the time and place of the Committee's hearing did not infringe in any way on respondent's right to confidentiality.[14]

Respondent's last argument before the Board on the adequacy of the opportunity to be heard issue is that he lacked an adequate opportunity to have counsel appointed and, therefore, lacked a meaningful opportunity to be heard with his counsel. The Board found that:

> Judge Buckson did not petition for the appointment of counsel within the relevant time limits or at any time. Judge Buckson also did not file an answer within the relevant time limits or at any time and did not appear at the hearing held on April 14. However, he did file his exceptions to my recommendations five minutes before the exceptions were due.

Final Report at p. 6 (footnote omitted).

Respondent argued in his objections to the Board's draft report that Ct.Jud.R. 7(d) required that the respondent be represented by counsel and that the Board appoint counsel if he is not represented by counsel. Respondent also contends that he requested the Board to appoint him counsel and the Board denied his request in replying that he needed to petition for the appointment of counsel. Respondent argued, therefore, that he lacked an adequate opportunity to be heard since the Board failed to appoint counsel as he requested and as the rule requires. As to this argument, the Board concluded:

> Judge Buckson's position is untenable. Rule 7(d) uses the phrase "shall appoint counsel" as the appointment of counsel is defined in Supreme Court Rule 68. Under Rule 68 (and under my April 7, 1992,

Order), a person must petition for the appointment of counsel. Furthermore, even though the phrase "shall appoint" in Rule 7(d) is nondiscretionary on its face, it obviously means that the Board shall appoint counsel when the petitioner is entitled to the appointment. It is ridiculous to argue that this phrase requires the Board to appoint counsel to a respondent in every case in this Court because such would result in the wasting of state resources via the state funding of state employees' legal defenses for matters not related to their state employment.

Final Report at p. 10.

The Board then found that respondent: (1) was given a number of opportunities to be heard; (2) had an opportunity to petition for the appointment of counsel; and (3) that the modification of the rules' time requirements did not affect respondent's rights in any meaningful way. Accordingly, the Board concluded that these proceedings did not violate respondent's due process rights.

Respondent's final due process argument before the Board was that Chief Judge Poppiti lacked authority to order him to retire, resign, or recant. Rejecting respondent's construction of 10 *Del.C.* § 908 as unreasonably narrow, the Board found that the Chief Judge of the Family Court had the implied power to order the judges of that Court to abide by ethical constraints. Therefore, the Board found that Chief Judge Poppiti had the power to issue such an order. Thus, the Board found that the issuance of such an order poses no due process problems.

The Board concluded that those proceedings did not violate respondent's due process rights because there was adequate notice, an adequate opportunity to be heard, and adequate authority for Chief Judge Poppiti's April 1 Order.

> Final Report at p. 9 n. 8. Also, it is to be noted that respondent finally, unequivocally waived confidentiality on April 22, 1992.

---

**14.** Moreover, the Board noted in a footnote: I question the sincerity of this argument given the reports in the press of Judge Buckson's desire to have these proceedings public. (*See* Presenter's Exh. 9—April 10, 1992, article of *The News Journal.*)

### C. *Wilful and Persistent Misconduct*

The Board then addressed what it found to be "the heart of this proceeding," *viz* whether the Board believed that respondent has engaged in wilful misconduct in office or other persistent misconduct in violation of the Code. Final Report at p. 11. The Board concluded that a judicial officer commits wilful misconduct in office when he acts "intentionally, knowingly, voluntarily, or with gross unconcern for his conduct, which would bring the judicial office into disrepute." *Id.* at 11 (citing *In the Matter of Rowe*, Del.Jud., 566 A.2d 1001, 1006 (1989)). In determining whether a judicial officer has committed wilful misconduct, the Board held that it is not necessary to find bad faith, but it is necessary that the facts be clear and convincing in order to find that the judicial officer, in fact, engaged in wilful misconduct. Ct. Jud.R. 7(f).

The Board noted that respondent implicitly argues in his exceptions that he "merely was testing the political waters," rather than being a full-fledged candidate. Final Report at 11–12. The Board found this argument unpersuasive. The Board found that the testimony of Mr. Battaglia, Mr. Glessner, and Chief Judge Poppiti and the articles in the press clearly demonstrate "that respondent and the public considered respondent to be a candidate for Governor." Final Report at p. 12. The Board also concluded that a person can be a candidate for a political office prior to the formal filing of nomination papers, citing generally, *State ex. rel. Burkett v. Swanson*, Neb.Supr., 291 N.W. 481, 482–83 (1940) (the Court noted that a person becomes a candidate when he announces that he will seek election to the office). Accordingly, the Board found that "it is clear that respondent is a candidate for a nonjudicial office." Final Report at p. 12.

Respondent had notice of Chief Judge Poppiti's April 1 Order either to retract his declaration to seek the Republican nomination for Governor or to resign from his judicial office. Although respondent did submit his resignation letter ten days after Judge Poppiti's order, the Board found that the failure of respondent to abide by Chief Judge Poppiti's Order is wilful misconduct within the meaning of Article IV Section 37 of the Delaware Constitution.

The Board found that respondent had spoken before political organizations, publicly endorsed himself as a candidate for Governor and attended political gatherings. Further, the Board found that he continues to engage in these actions. Accordingly, the Board found that the record established by clear and convincing evidence that respondent intentionally violated Canon 7A(2) and (3). Final Report at p. 13.

The Board noted that the more difficult issue is whether respondent's candidacy falls within Canon 7B relating to candidacy in a party primary or general election. Although Canon 1 requires that the judge be independent so as to further the objective of maintaining high standards of conduct for the judiciary, the Board concluded that he could not find that respondent violated Canon 7B because respondent is not a candidate in a party primary since no party primary has occurred or is occurring.

With respect to Canon 7C, the Board concluded:

> Even though Judge Buckson's candidacy technically does not fall within the ambit of Canon 7(B), it most certainly falls within the ambit of Canon 7(C). As stated earlier, he has engaged in, and continues to engage in, political activity via his candidacy for a nonjudicial office. Further, the Presenter has provided clear and convincing evidence that the acts are not measures to improve the law, the legal system or the administration of justice as those terms are defined by the Canons. Therefore, I find that the Presenter has demonstrated by clear and convincing evidence that Judge Buckson intentionally has violated Canon 7(C). Likewise, I find Judge Buckson's acts whereby he gave press conferences and issued press releases discussing his qualifications for the office were intentional violations of Canon 7(C).

Final Report at p. 14.

Finally, the Board found that respondent's acts violated Canon 1, calling into

question the independence and integrity of the judiciary. The Board found that:

> A judge who actively seeks the nomination of a political party as its candidate necessarily jeopardizes the independence and integrity of the judiciary. The judge cannot separate the positions taken on political or policy matters from the office which he occupies. Furthermore, Judge Buckson's unofficial retirement from all judicial activities while drawing his judicial salary and engaging in political activities pending the resolution of this matter diminishes public confidence in the integrity of the judiciary. Thus, I find that the Presenter has demonstrated by clear and convincing evidence that Judge Buckson intentionally violated Canon 1.
>
> Ultimately, in our legal system, the role of a judge is to preside over legal disputes in an impartial and dispassionate manner. A judge undermines the public confidence in the integrity of this process when, rather than challenging rules applicable to judges through the proper channels, the judge intentionally disregards the rules and when the judge's independence is questionable. To say the least, Judge Buckson's intentional disregard for the ethical constraints imposed on judges and his conduct which brings his independence into question sets a poor example. Indeed, his conduct is contemptible [15] and, in fact, punishable.

Final Report at pp. 14–15.

D. *Recommendations Of The Board*

The Board's recommendations to this Court are as follows:

> I find that Judge Buckson's intentional violations of Chief Judge Poppiti's April 1 Order and Canons 1, 7(A)(2), 7(A)(3) and 7(C) of the Delaware Judges' Code of Judicial Conduct constitute, individually and collectively, clear and convincing evidence of wilful misconduct as defined by Delaware Constitution art IV, § 37. Also, I find that Judge Buckson's intentional violations of Canons 1, 7(A)(2), 7(A)(3) and 7(C) constitute, individually and collectively, clear and convincing evidence of persistent misconduct in violation of the Delaware Judges' Code of Judicial Conduct. Finally, I conclude that it is constitutional and appropriate to sanction Judge Buckson for his conduct. Therefore, I respectfully recommend that the Court on the Judiciary remove Judge Buckson from office, *see In re Schamel*, N.Y.Supr. [46 A.D.2d 236], 362 N.Y.S.2d 39 (1974), publicly censure him for his acts and order him to restore all monies received by him [16] from the State as a judicial officer from March 31, 1992, until the date of his removal.

Final Report at pp. 15–16.

## IV. SCOPE AND STANDARD OF REVIEW

■ We now turn to respondent's due process challenges to these disciplinary proceedings and to the merits. Before the Court are the report of the Committee, the Final Report of the Board, and the Hearing Transcript. The Board's recommendations included in the Final Report have "the force and effect of a master's report in Chancery". *In the Matter of Hopkins*, Del.Jud., 566 A.2d 1011, 1014 (1989); *In the Matter of Rowe*, Del.Jud., 566 A.2d 1001, 1005 (1989); Ct.Jud.R. 9(a). "Therefore, this Court is obligated to conduct it own evaluation of the evidence adduced by the Board and reach an independent conclusion as to the sanctions to be imposed." *Rowe*, 566 A.2d at 1006. The Board and the Court are required to find that the "[f]acts justifying the action taken ... [have been]

---

**15.** The Board explained in a footnote:
 I do not intend the word contemptible to mean "contempt" in the legal sense of the word.
 Final Report at p. 15 n. 10.

**16.** The Board explained in a footnote:
 The justification for this restoration of monies is that the evidence clearly demonstrates that the only work Judge Buckson has done since March 31 has been in furtherance of his candidacy. He has done no work in his judicial capacity since that date. Therefore, I recommend that the Court on the Judiciary not allow him to keep his judicial pay for this time period.
 Final Report at p. 16 n. 11.

established by clear and convincing evidence." Ct.Jud.R. 7(f). We adopt the findings of fact and conclusions of law in the Final Report of the Board and find that they have been established by clear and convincing evidence. We also accept the recommendations of the Board, except for the recommendation of forfeiture.

## V. NO CLEAR AND CONVINCING EVIDENCE SUPPORTING FORFEITURE

 This Court derives its authority to sanction judicial officers from Article IV Section 37 of the Delaware Constitution which expressly grants the Court the power to "censure, remove, or retire" any judicial officer. *Rowe*, 566 A.2d at 1009. In *Rowe*, the Court determined that "the drafters of this important amendment to the constitution [did not intend] to limit disciplinary action to 'censure, removal, or retirement' with no sanctions available short of retirement or removal except a mere censure." *Rowe*, 566 A.2d at 1010; *see also* Ct.Jud.R. 9(c)(5) (authorizing the Court to censure, *suspend*, remove or retire a judicial officer under Article IV Section 37 of the Delaware Constitution). Rather, the Court concluded that the power to suspend a judicial officer is inherent in the express powers granted by Article IV Section 37 of the Delaware Constitution. As was recognized in *Rowe*, the granting of the power to remove implicitly carries with it the power to impose less severe sanctions short of removal. *Rowe*, 566 A.2d at 1010 (citing *In the Matter of Anderson*, 312 Minn. 442, 252 N.W.2d 592 (1977); *In the Matter of Cieminski*, N.D.Supr., 270 N.W.2d 321 (1978)); *Fisher v. Thompson*, Del.Jud., C.A. No. 1 (1973) (the power to remove a judicial officer "includes the power to suspend such officer since that is merely a lesser form of punishment") (attached hereto as Appendix B);

*see also Nicholson v. Judicial Retirement and Removal Commission*, Ken.Supr., 562 S.W.2d 306, 310 (1978) ("[i]f the Commission can remove a judge from office, it can certainly impose lesser sanctions in order to achieve the ultimate goal of judicial purification.").

As stated in the April 30 Order, the Court is empowered to impose the sanctions of (a) removal from office; (b) retirement; (c) suspension; (d) cessation of all authority, rights, and privileges as a judicial officer; (e) declaration that a vacancy thereby exists in the judicial office previously held by respondent; (f) public censure; and (g) forfeiture of benefits, including restoration by respondent of any monies paid to respondent from March 31, 1992, to the date and time of removal. *See Fisher v. Thompson*, Del.Jud., C.A. No. 1 (1973) (ordering respondent to repay to the State judicial salary received during period when respondent performed "almost no services of any kind to the State").

In the present case, the Board recommended that respondent be ordered "to restore all monies received by him from the State as a judicial officer from March 31, 1992, until the date of [respondent's] removal." Final Report at p. 16. The Court, however, does not find on this record that there is clear and convincing evidence to support the forfeiture recommended given the unclear state of this record regarding respondent's vacation rights and the fact that he was ordered on April 1, 1992, by Family Court Chief Judge Poppiti not to "hear or decide any judicial matters or act in any judicial capacity whatsoever until the propriety of your political activity has been resolved."[17]

## VI. PROCEDURAL DUE PROCESS CHALLENGE

 Respondent contends that he has been denied procedural due process, in vio-

---

**17.** Nevertheless, it is clear that Chief Judge Poppiti's powers and duties as the administrative head of the Family Court and the proper administration of justice authorize him to act as he did in this case. The chief judges of the various Delaware courts may order that judges, over whom they have administrative authority, who have been formally charged with extremely serious ethical charges, such as those presented in this case, not continue the adjudication of rights of litigants or participate in the important work of the courts while this Court determines the appropriate disposition of disciplinary matters before it relating to the conduct of the judge in question.

lation of the Fourteenth Amendment to the United States Constitution and Article I Section 7 of the Delaware Constitution. This contention is based upon the assertions that: (A) the Court failed to give him adequate notice and a meaningful opportunity to be heard prior to the issuance of the *sua sponte* orders expediting these proceedings; (B) such orders resulted in such expedited treatment that he was denied time adequately to prepare and present his defense; and (C) the Board failed to appoint counsel to represent him at the Board hearing in violation of Ct.Jud.R. 7(d). In essence, respondent argues that he has a substantive right that this matter proceed in strict accordance with the procedural rules of the Court on the Judiciary.

In *Slawik v. State*, Del.Supr., 480 A.2d 636, 644–45 (1984),[18] the Court stated: "A rudiment of procedural due process is the right to receive notice and to be heard 'at a meaningful time and a meaningful manner,' prior to the deprivation of a protected interest." 480 A.2d at 645 (citations omitted). " '[D]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances" but it is "flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (citations omitted). Judge Buckson has a right to procedural due process. Indeed, Article IV, Section 37 expressly provides that a judicial officer "shall have had an opportunity to be heard in accordance with due process of law." We disagree, however, with his contention that he was deprived of due process in these proceedings and we agree with the findings and conclusions of the Board on this point.

Procedural rules designed to foster the orderly transaction of business before the Court do not confer substantive rights on a litigant. *See Tiffany v. O'Toole Realty Co.*, Del.Super., 153 A.2d 195, 199 (1959) (courts may make procedural rules but not rules which create substantive rights). As to respondent's first contention, therefore, the relevant inquiry is *not* whether he was denied adequate notice and the opportunity to be heard prior to the issuance of the April 1, 7, 21, and 23, 1992 Orders. Rather, the issue is whether he was given adequate notice of the charges pending against him and a meaningful opportunity to be heard on the merits of the charges. Having carefully considered the record in this case and for the reasons stated below, we conclude that respondent's procedural due process claims are without merit.

### A. Expedited Proceedings Before The Committee And The Board

■ Respondent first contends that the Court violated his right to procedural due process by failing to give him adequate notice and the opportunity to be heard prior to the *sua sponte* issuance of the April 1, 7, 21, and 23 Orders expediting the proceedings in this case. Specifically, he contends that, although the Court has the authority to "suspend" its rules pursuant to Ct. Jud.R. 10(i), the Court lacks the express authority to "modify" or "supersede" its rules in order to expedite a judicial disciplinary matter. It is settled law, however, that:

> It is always within the discretion of a court or an administrative agency to relax or *modify* its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of *substantial prejudice* to the complaining party.

*American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970) (emphasis supplied) (citations omitted).

The Court clearly has the authority to "suspend" its rules. In doing so, the Court

---

**18.** Although the Delaware Supreme Court in *Slawik* held that an elected public office is not a "property" interest protected by the due process clause of the Fourteenth Amendment, the United States Supreme Court in *Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972) held that procedural due process extends to anything to which a person may assert a legitimate claim of entitlement.

has the inherent, plenary power to "modify" or "supersede" its rules.[19] While the Court must exercise this authority in a manner consistent with procedural due process principles, in order for respondent to prevail on his procedural due process claims, he must show that the expedited proceedings in this case caused him actual and substantial prejudice (*i.e.*, by preventing him from securing or presenting evidence material to the merits of this case during any phase of these proceedings). *See American Farm Lines*, 397 U.S. at 539, 90 S.Ct. at 1292; *Matter of Storie*, Mo.Supr., 574 S.W.2d 369, 372 (1978); *McCartney v. Commission on Judicial Qualifications*, 12 Cal.3d 512, 116 Cal. Rptr. 260, 280–81, 526 P.2d 268, 272–73 (1974); *In re Robson*, Alaska Supr., 500 P.2d 657 (1972). We conclude that it was within the express authority of Rule 10(i) and the inherent, plenary authority of the Court to suspend, modify, and supersede its rules, as was done in this case. We further conclude that such action and the expedited proceedings did not cause respondent actual and substantial prejudice, and did not violate respondent's right to procedural due process.[20]

■■■■ Respondent next contends that he was not given meaningful notice of the Committee hearing and that he was denied a meaningful opportunity to be heard at that hearing because the hearing was not conducted in a confidential manner as required by Ct.Jud.R. 10(d). The record shows, however, that on April 1, 1992, respondent received a copy of the complaint notifying him of the charges pending against him. On the same date, he re-ceived the Court's April 1 Order notifying him that the preliminary investigation would be expedited given the exigencies present in this case. On April 2, 1992, pursuant to Ct.Jud.R. 3(d)(4), respondent received notice that he would be given the opportunity to appear and be heard before the Committee at a hearing scheduled for 10:00 a.m. on April 6, 1992, at the Superior Court, Courtroom No. 2, Kent County Courthouse in Dover, Delaware. While he objected to the place of the hearing, he did not object to the order expediting the proceedings.

Rather, having been provided with the requisite notice and opportunity to be heard on the merits pursuant to Ct.Jud.R. 3(d)(4), respondent refused to attend the Committee hearing allegedly because his appearance at the courthouse "would result in an influx of news media" and, therefore, would not be confidential. Respondent has offered no evidence that the hearing would not have been, and was not, conducted in a private and confidential manner, or that he would have suffered actual and substantial prejudice by having to appear at the location designated. *Cf. McCartney v. Commission on Judicial Qualifications*, 12 Cal.3d 512, 116 Cal. Rptr. 260, 282, 526 P.2d 268, 274 (1974) (location of hearings into alleged judicial misconduct is discretionary). We conclude, therefore, that his conscious refusal to attend this hearing constituted a waiver of his right to be heard before the Committee. *See Loyd v. Loyd*, 731 F.2d 393, 400 (7th Cir.1984) (no due process violation where litigant had prior notice of relevant pro-

---

**19.** Good cause to expedite the proceedings in this case, although not required to be shown under Ct.Jud.R. 10(i), was established upon respondent's announcement on March 30, 1992, of his intention to engage in political activities preliminary to the State convention of his party scheduled for May 9, 1992, in order to secure the nomination for Governor of the State of Delaware. Since respondent's conduct raised at least the probability of a continuing, wilful violation of the Judicial Canons, expedited proceedings were necessary and required in order to preserve the integrity and independence of the judiciary. *See, e.g.,* April 7 Order, ¶ 3.

**20.** It is worth noting that prior to the institution of the disciplinary proceedings in this case, respondent was well aware that his anticipated political activities might violate the Judicial Canons of the State of Delaware. At a press conference on March 30, 1992, he stated that he had already conducted legal research and consulted other lawyers and concluded that he was free to engage in political activities up until the point that he either won the Republican Party endorsement or he filed to be a primary election candidate. Final Report at p. 3 (citing Nancy Kesler, "Judge to Make Bid for Governor," *The News Journal,* Mar. 31, 1992, Section B).

ceeding yet chose not to participate or exercise opportunity to be heard).

■ Respondent further claims that he was prejudiced because the Court failed to provide him an adequate amount of time to prepare and present an answer to the complaint. Since respondent has made no showing that reducing the period of time in which to answer the complaint in this case caused him actual and substantial prejudice, we conclude that respondent's right to procedural due process was not violated.

### B. *Right To Appointment Of Counsel At The Board Hearing*

■ Respondent next contends that the Board violated his right to procedural due process by failing to appoint counsel to represent him at the Board hearing pursuant to Ct.Jud.R. 7(d) (respondent *"must* be represented by counsel and if he is not represented by counsel of his choice, the Board *shall* appoint counsel to represent him ...") (emphasis added). Although Ct. Jud.R. 7(d) is a procedural rule which confers a procedural right to be represented by counsel at the Board hearing, it does not create a substantive right to the appointment of counsel. *Tiffany v. O'Toole Realty Co.*, Del.Super., 153 A.2d 195, 199 (1959) (courts may make procedural rules but not rules which create substantive rights). Accordingly, in order for respondent to prevail on his claim that the Board's failure to appoint counsel to represent him until he filed his petition under Supr.Ct.R. 68 on April 20, 1992, constituted a procedural due process violation, he must show actual and substantial prejudice. *See American Farm Lines*, 397 U.S. at 539, 90 S.Ct. at 1292; *Matter of Storie*, Mo.Supr., 574 S.W.2d 369, 372 (1978); *McCartney v. Commission on Judicial Qualifications*, 12 Cal.3d 512, 116 Cal.Rptr. 260, 280–81, 526 P.2d 268, 272–73 (1974); *In re Robson*, Alaska Supr., 500 P.2d 657 (1972).

■ The record shows that respondent received the Court's April 7 Order notifying him that an Examining Board would be convened and that the Board would require him to inform the Board by April 10, 1992, of his intention to seek

counsel in accordance with the requirements of Supr.Ct.R. 68 which applies, *inter alia,* to judicial disciplinary proceedings once the Court appoints the Board pursuant to Ct.Jud.R. 5. On April 8, 1992, respondent received the Board's Order to Show Cause and the notice of the Board hearing scheduled for April 14, 1992. Both orders directed respondent: (a) to inform the Board by April 10, 1992, of his intention to seek the appointment of counsel; and (b) to file a petition for appointment of counsel, pursuant to Supr.Ct.R. 68(c), immediately. Respondent ignored both of these orders.

Instead, respondent waited until late in the afternoon of April 13, 1992, to advise the Board that he would not be attending the hearing on April 14, 1992. He claims, notwithstanding this Court's April 1 and April 7 Orders, that he believed he had 15 days under Ct.Jud.R. 3(d)(4) or until April 21, 1992, before he had to respond formally to the report of the Committee. He advised the Board that he was not sure whether or not someone would appear for him at the hearing since he had not yet made any effort to contact counsel. He also asked if the Board would proceed to appoint someone to represent him at the hearing. The Board referred respondent to the "order to show cause" setting forth the procedures for securing counsel and to the Attorney General's office which was standing by to receive his application for representation.

Respondent proceeded to contact the Attorney General's office. Immediately thereafter, the State Solicitor notified the Board that he had serious doubts whether the Attorney General's office would consent to represent respondent for essentially three reasons: (a) respondent's conduct did not appear to fall within the parameters of Supr.Ct.R. 68 which provides for representation of a public officer of the State for acts arising out of employment with the State; (b) it would be irresponsible to accept representation of someone who was not going to appear at the hearing; and (c) there did not appear to be any arguments that could responsibly be made on respon-

dent's behalf. Respondent was made aware of the Attorney General's position and was again advised that a petition for appointment of counsel had to be filed directly with the Court on the Judiciary for consideration pursuant to Supr.Ct.R. 68. The Board encouraged respondent to find someone to represent him, to·appear at the hearing, and to make any appropriate application, including an application to postpone or continue the hearing. Nevertheless, respondent made it clear that he would not appear.

Both the Court's order dated April 7, 1992, and the Board's "order to show cause" dated April 8, 1992, notified respondent of the proper procedures to be followed for securing counsel under Ct.Jud.R. 7(d) and Supr.Ct.R. 68. In view of this advance notice to respondent, his deliberate failure timely to comply with these very clearly stated procedures, and his advance notice to the Board that he would not be attending the hearing, the Board was completely justified in declining to appoint counsel to represent respondent at the hearing. We conclude, moreover, that respondent's less than diligent effort to secure counsel in accordance with these orders and his conscious refusal to attend the Board hearing constituted a waiver of his procedural right to be heard with counsel at the hearing. *See Loyd v. Loyd,* 731 F.2d 393, 400 (7th Cir.1984) (no due process violation where litigant had prior notice of relevant proceeding yet chose not to participate or exercise opportunity to be heard).

■ Respondent finally claims that he was prejudiced because the Board conducted the hearing in a non-adversarial fashion. This contention is based upon the assertion that counsel could have strengthened respondent's "testing the waters" defense by further investigating whether respondent had formed a campaign organization, solicited funds, solicited votes, or distributed campaign literature. It is apparent, however, that since respondent has conceded that the Board's findings of fact are not in dispute, the existence of such additional evidence would not negate the evidence relied upon by the Board and this Court in

concluding that respondent has deliberately violated Judicial Canons 1, 7A(2), 7A(3), and 7C. Moreover, counsel for respondent was appointed by the Court in time to enable respondent's counsel to present respondent's position fully to the Board in the form of objections to the Board's draft report. Given these facts, respondent's waiver of his right to be heard with counsel at the Board hearing, and the absence of any showing of substantial prejudice, we conclude that respondent's right to procedural due process was not violated.

## VII. WILFUL AND PERSISTENT MISCONDUCT

Having concluded that respondent's right to procedural due process has not been violated during any phase of these disciplinary proceedings, we next address the merits of the charges brought against respondent. The Court has carefully evaluated the undisputed findings of fact made by the Board and concludes that the Board's findings are supported by clear and convincing evidence. The Court, therefore, adopts these findings of fact for purposes of determining whether respondent's political activity constituted a wilful violation of Canons 1, 7A(2), 7A(3), and 7C of the Delaware Judges' Code of Judicial Conduct and whether such conduct constituted persistent and wilful misconduct as proscribed by Article IV Section 37 of the Delaware Constitution. Respondent raises three defenses to the Board's conclusion that he wilfully violated Canons 1, 7A(2), 7A(3), and 7C: (a) his political activity constituted a mere preliminary survey of financial and voter support (*i.e.,* "testing the waters") which should be permitted under Canon 7; (b) the "resign-to-run" rule violates the First Amendment; and (c) the phrase "political gathering" contained in Canon 7A(3) is unconstitutionally vague.

### A. *"Testing The Waters" Defense*

■ The record shows that on March 19, 1992, respondent addressed Family Court employees at an employees awards luncheon held in the Kent County Family Court Building. On that occasion, respon-

dent stated that he was seeking the Republican nomination for Governor and would retire if he gained that nomination. Respondent subsequently issued a press release on March 30, 1992, announcing his "candidacy" for the Republican party's nomination for the office of Governor. *See Application of Pioneer Mill Co.*, 53 Haw. 496, 573, 497 P.2d 549, 551–53 (1972) (adopting the ordinary meaning of the word "candidate" as one who announces that he seeks or aspires to a particular office and rejecting the notion that one is not a candidate until he files nomination papers); *State ex rel. Burkett v. Swanson*, 137 Neb. 704, 291 N.W. 481, 482 (1940) (person becomes a "candidate" for office when he announces that he will seek election to the office). The record further shows that respondent attended the following political meetings at which he publicly endorsed himself as a candidate for Governor: the Colonial region caucus on April 6, 1992, the Kent County region caucus on April 8, 1992, and the Brandywine region caucus on April 13, 1992. At the Brandywine region caucus, while wearing a pin that said, "Buckson for Governor," respondent was introduced as, and spoke as, a judge who was a candidate for Governor. Respondent concedes the accuracy of these facts.

Relying upon language contained in *Morial v. Judiciary Com'n of State of La.*, 565 F.2d 295 (5th Cir.1977), *cert. denied*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978), respondent contends that this political activity did not constitute a violation of Canon 7 which states that a Judge should refrain from political activity inappropriate to his judicial office. Respondent's contention is based upon the assertion that the evidence shows nothing more than that he was merely "testing the waters" by conducting "preliminary surveys of financial and voter support." In *Morial*, a Louisiana state judge was interested in becoming a non-party candidate for the office of Mayor of New Orleans. The judge challenged, on First Amendment and Fourteenth Amendment grounds, the constitutionality of a Louisiana statute which required a

judge to resign his judicial office prior to becoming a candidate for non-judicial office (a "resign-to-run" rule). One of the factors considered by the court when addressing the impact of the resign-to-run rule on judges' First Amendment interests was that Louisiana appeared to apply the rule in such a manner that judges are permitted to conduct preliminary surveys of financial and voter support. The Court stated:

> [T]he Louisiana rule is administered in such a manner as to mitigate somewhat the deterrent effect of the resignation requirement. The letter which informed Judge Morial that Canon 7(A)(3) barred him from active candidacy while still a judge also informed him that the canon did not prohibit preliminary surveys of financial and voter support. In other words, the canon does not require a prospective candidate to balance a secure judgeship against a complete leap in the dark. The *prospective* candidate need not resign merely to learn whether he has a realistic chance of election.

*Morial*, 565 F.2d at 301 (emphasis added).

While we agree that a judge should not have to resign merely to learn whether he has a realistic chance of election, a judge in Delaware who chooses to "test the waters" as a *prospective* candidate must, nevertheless, do so in a manner consistent with the Delaware Judges' Code of Judicial Conduct. Respondent's political activity went well beyond that of a *prospective* candidate conducting preliminary surveys of financial and voter support. The record is clear that he had publicly announced his "candidacy" in violation of Canon 7A(2) and was actively engaged in political activity in violation of Canon 7C in order to secure the Republican party's nomination for Governor. Therefore, we conclude that respondent's "testing the waters" defense is without merit.

B. *Constitutionality Of The Resign–To–Run Rule*

In *Morial*, the court squarely addressed the constitutionality of a resign-to-run statute.[21] We find the reasoning em-

---

**21.** Although Judge Buckson relies heavily on the "testing the waters" language in *Morial* to sup-

ployed in the *Morial* case on this issue to be persuasive.[22]

The Supreme Court has not recognized a fundamental right to candidacy. *Bullock v. Carter*, 405 U.S. 134, 142–44, 92 S.Ct. 849, 855, 31 L.Ed.2d 92 (1972). Respondent contends, nevertheless, that, since political expression and voting are consistently found to be protected activities, a political candidacy should be recognized as a fundamental right. *See* Neil M. Horwitz, Comment, *The Introduction of Resign–to–Run Statutes: Morial v. Judiciary Commission of Louisiana*, 53 St.Johns.L.R. 571, 579–80 (1979); *but see* Allan Ashman, David L. Lee, Judith Rosenbaum, *Judges in an Age of Mistrust: Morial and the Policy of Required Resignation*, 54 Tulane L.Rev. 382 (1980). Respondent contends that the resign-to-run rule is unconstitutional because "a leave of absence for the duration of a campaign" is a less intrusive means to vindicate the State's interests. In *Morial*, the Court noted that the state had legitimate interests in: (a) preventing "abuse of the judicial office by a judge-candidate during the course of the campaign"; (b) preventing "abuse of the judicial office by judges who have lost their electoral bids and returned to the bench"; and (c) "eliminating even the appearance of impropriety by judges both during and after the campaign." *See Morial*, 565 F.2d at 302–03 (evaluating the State's interests and their relation to the resign-to-run rule).

Based upon these contentions, respondent impliedly argues that the resign-to-run rule should be subjected to strict constitutional scrutiny. The *Morial* court, however, subjected the resign-to-run rule to a "reasonable necessity" standard of review. In formulating the "reasonable necessity" standard, the court carefully considered the standard of review employed by the Supreme Court in cases involving broad restrictions upon the political activity of fed-

eral and state civil service employees. *See U.S. Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 575–76, 93 S.Ct. 2880, 2895–96, 37 L.Ed.2d 796 (1973); *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The court concluded that the requisite closeness of fit between the means selected by the State to achieve its asserted interests must be determined, case-by-case, based upon the relative severity of impairment of First Amendment interests. *Morial*, 565 F.2d at 300.

In evaluating the impact of the resign-to-run rule on the First Amendment interests of judges, the court recognized that the rule heavily burdens the exercise of an important, if not constitutionally "fundamental," right to become an active candidate for non-judicial office by forcing a judge to resign a remunerative position of considerable prestige and power merely to run. The court also recognized, however, that the resign-to-run rule leaves unaffected core First Amendment values such as the right to vote for the candidate of one's choice and to make statements regarding one's private opinions on public issues outside a campaign context. The court finally noted that the resign-to-run rule, by excluding judges as a class, does not substantially impact upon the availability of other candidates to represent any particular group or viewpoint.

Based upon these findings, the *Morial* court concluded that the impairment of a judge's interest in free expression and political association stemming from enforcement of the resign-to-run rule was not sufficiently grievous to justify the strictest constitutional scrutiny. Instead, the court employed the "reasonable necessity" standard of review which required the State "to show a reasonable necessity for requiring judges to resign prior to becoming candi-

---

port his contention that such political activity does not violate Canon 7, the "testing the waters" language is actually a relatively minor part of the court's analysis upholding the constitutionality of the resign-to-run statute.

**22.** The *Morial* case involved the construction of a statute which required a state judge to resign

his office prior to becoming a candidate for non-judicial office. The present case, however, also involves a resign-to-run rule to the extent that an administrative directive ordered Judge Buckson immediately to resign or retire from the Family Court if he was unwilling to retract his candidacy.

dates for elective non-judicial office." *Morial*, 565 F.2d at 302. The court stated that prevention of post-campaign abuse by judges who have returned to the bench following an electoral defeat calls for measures that are effective during the post-campaign period. The court expressly recognized, however, that a "leave of absence" would be a wholly ineffective measure in preventing post-campaign abuse or its appearance.

Moreover, although there may be less intrusive means available to achieve the State's interest in preventing post-campaign abuse (*i.e.*, disciplinary proceedings against judges or strict rules of recusal), the Court stated that, under the "reasonable necessity" standard of review, the State was not required to employ the least intrusive means available. *Id.* at 303. Finally, in upholding the constitutionality of the resign-to-run statute, the court concluded that the resign-to-run rule "bears a reasonably necessary relation to the achievement of the state's interest in preventing the actuality or appearance of judicial impropriety." *Id.* at 307. We agree with the reasoning employed in the *Morial* case and, therefore, conclude that respondent's challenge to the resign-to-run rule in this case is without merit.

### C. *Respondent's Claim Of Vagueness Of The Term "Political Gathering"*

■ Finally, we consider respondent's contention that the phrase "political gathering" in Canon 7A(3) is unconstitutionally vague. Canon 7A(3) states that "[a] judge should not ... attend political gatherings." Respondent contends that it is unclear at what point attendance by a judge at a meeting with one or more voters, which has a gubernatorial campaign as its topic, violates Canon 7A(3). In support of this contention, respondent asks:

> Is a meeting of a judge with one voter which has a gubernatorial campaign as its topic a "political gathering"? If not one voter then how many voters? If a judge attends a political gathering to test the waters, is that prohibited?

Opening Brief at p. 22.

To prevail on this challenge, respondent must demonstrate that the phrase "political gathering" in Canon 7A(3) is impermissibly vague in all of its applications. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497, 102 S.Ct. 1186, 1993, 71 L.Ed.2d 362 (1982). Under the facts of this case, respondent cannot show that the term is vague as applied to his overt, blatantly political activity. Although we conclude for the reasons stated below that respondent lacks standing to challenge Canon 7A(3) on vagueness grounds, we shall nevertheless address his vagueness challenge.

In order to withstand the vagueness challenge, the prohibition in Canon 7 against attendance of "political gatherings" by judges must be sufficiently definite so that an ordinary person exercising ordinary common sense can sufficiently understand what conduct is prohibited and can conform his conduct accordingly. *See Letter Carriers*, 413 U.S. at 579, 93 S.Ct. at 2897, 37 L.Ed.2d 796 (1973); *Broadrick*, 413 U.S. at 608, 93 S.Ct. at 2914, 37 L.Ed.2d 830 (1973). When construing the meaning of rules adopted by this Court, the words used should be given their ordinary meaning. The term "gathering" is defined as "a coming together of people in a group (as for social, religious, or *political purposes*)." *Webster's Third International Dictionary* 940 (1986) (emphasis added). This definition does not provide a bright line standard for determining what constitutes a "gathering" based solely upon the number of people attending a meeting. The definition, however, does explicitly reference the purpose of a meeting (*i.e.*, a political purpose) in order to place the term "gathering" in a proper context.

By considering the purpose underlying a particular "gathering" which a judge is interested in attending, it is reasonable to expect that a judge can readily determine whether his attendance would constitute a violation of the Canon's proscription against the attendance of "political gatherings." *See also Letter Carriers*, 413 U.S. at 576–79 n. 21, 93 S.Ct. at 2896–97 n. 21, 37 L.Ed.2d at 814–17 n. 21 (statutory prohibition against federal employees taking "an active part in political management or in political campaigns" as refined in regula-

tions, 5 C.F.R. § 733.122, which includes a prohibition against "addressing a convention, caucus, rally, or similar gathering of a political party in support of ... a partisan candidate for public office", is not unconstitutionally vague); *Broadrick*, 413 U.S. at 607–11, 93 S.Ct. at 2913–15, 37 L.Ed.2d at 837 (1973) (state statutory provision prohibiting a state classified employee, *inter alia*, from being "a candidate for nomination or election to any paid public office" is not impermissibly vague).[23]

 Finally, assuming *arguendo* that the Canon 7 prohibition against attending political gatherings could be found to be unconstitutionally vague as applied to the conduct of others, we find that respondent's conduct in attending the regional caucuses to advance his candidacy clearly falls within the proscriptions of Canon 7A(3). Therefore, notwithstanding our conclusion that Canon 7A(3) is not unconstitutionally vague, we conclude that respondent lacks standing to challenge Canon 7A(3) on vagueness grounds. *E.g., Village of Hoffman Estates*, 455 U.S. at 495, 102 S.Ct. at 1191, 71 L.Ed.2d 362 (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."); *Broadrick*, 413 U.S. at 608–10, 93 S.Ct. at 2914–15, 37 L.Ed.2d at 838–39 (1973).

## VIII. CONCLUSION

 We find that the record before the Board establishes by clear and convincing evidence that respondent was engaged in prohibited political activity of a continuing nature. He was attending and speaking at political gatherings and publicly endorsing himself as a "candidate" for the office of Governor without first resigning his judicial office. We conclude that this conduct constitutes a wilful violation of Canons 1, 7A(2), 7A(3), and 7C and constitutes persistent and wilful misconduct as proscribed by

Article IV Section 37 of the Delaware Constitution.

As provided in the April 30 Order: Respondent has been removed from the office of Associate Judge of the Family Court of the State of Delaware and was directed to cease all judicial activities effective at noon EDT on April 30, 1992. A vacancy in the office formerly held by respondent was thereupon deemed to exist. In addition, respondent has been publicly censured as follows: Respondent's continuing behavior as found herein is unethical, deplorable, irresponsible, and demeaning of a judicial office. Such conduct fails to observe and maintain the high standards of conduct required so that the integrity and independence of the judiciary may be preserved. Notwithstanding the foregoing sanctions, the Court does not intend to impose any forfeiture of entitlements which may have existed prior to the date and time of the Court's April 30 Order.

The April 30 Order implementing the foregoing opinion is attached and is incorporated herein by reference.

## APPENDIX A

### IN THE COURT ON THE JUDICIARY OF THE STATE OF DELAWARE

In the Matter of:

The Honorable David P. Buckson,

a Judicial Officer

C.J. No. 7, 1992

Submitted: April 29, 1992

Decided: April 30, 1992

Before VEASEY, Chief Justice, HORSEY, MOORE, WALSH, and HOLLAND, Justices, ALLEN, Chancellor, and RIDGELY, President Judge constituting the Court on the Judiciary.

This 30th day of April, 1992, upon consideration of the entire record herein, the

---

**23.** It is also significant that Delaware has established an informal procedure whereby a judge in doubt about the propriety of a proposed course of conduct may seek and obtain advice from the Judicial Proprieties Committee of the Delaware Judicial Conference (Supr.Ct.R. 81), and thereby remove any doubt there may be as to the meaning of a particular Canon. *See Letter Carriers*, 413 U.S. at 580, 93 S.Ct. at 2897–

98, 37 L.Ed.2d at 817. Although respondent claims to have conducted independent research on the application of the Canons to his political activity, respondent did not contact the Judicial Proprieties Committee for guidance to clarify the meaning of Canon 7 prior to engaging in the political activities which are the subject of this disciplinary proceeding.

briefing by counsel for respondent and the presenter, and the oral argument presented to the Court on April 29, 1992, it appears to the Court that:

1) The matter is before the Court on the Judiciary (the "Court"), pursuant to authority conferred by Article IV § 37 of the Delaware Constitution, for determination of several issues arising out of alleged charges of misconduct filed against the respondent, the Honorable David P. Buckson, an Associate Judge of the Family Court of the State of Delaware. Vice Chancellor William B. Chandler, III was appointed as the Board of Examining Officer (the "Board"), pursuant to Court on the Judiciary Rule 5(a), by the Court's April 7, 1992 Order. The conduct in question, which is set forth in the Final Report of the Board dated April 21, 1992 (the "Final Report"), relates to respondent's alleged political activities in his attempt to seek the endorsement of his party convention for the nomination for Governor of the State of Delaware, without first resigning his judicial office.

2) The record includes matters set forth in the transcript and exhibits thereto of the April 14, 1992, hearing (the "Hearing Transcript") before the Board and the Final Report of the Board. The Hearing Transcript and Final Report are hereby incorporated by reference.

3) Court on the Judiciary Rule 9(c)(5) provides:

(5) *At the earliest practical time,* the Court shall file a written opinion and order dismissing the charges against the respondent, or censuring, suspending, removing or retiring the respondent under Article IV, § 37 of the Delaware Constitution. The affirmative concurrence of not less than two-thirds of the members of the Court shall be necessary for censure, suspension, removal or retirement.

(Emphasis supplied.) The exigencies of this matter have required that the Court decide the issues before the Court as promptly as practicable, consistent with the interests of justice. The Court has reached a unanimous decision, set forth in this Order. A formal Opinion of the Court, more fully explicating these issues, will be filed hereafter.

4) Respondent contends that he has been denied due process by the expedited procedures herein, in that such procedures had the effect of depriving him of adequate notice, a meaningful opportunity to be heard, and the effective assistance of counsel at certain stages of the proceedings.

5) The Court has concluded that respondent was not deprived of due process of law. The Court's actions reflected in its Orders of April 1, April 7, April 21, and April 23, 1992, all of which Orders are hereby incorporated by reference, were authorized by the Rules of the Court, including Court on the Judiciary Rule 10(i). Moreover, the procedures employed by the Court were necessitated by the exigencies of the case, properly implemented the authority granted by the Rules of this Court, and were fair to respondent. Respondent has failed to demonstrate that he suffered actual and substantial prejudice.

6) Respondent was not denied the effective assistance of counsel. The Board was not required to appoint counsel for respondent in proceedings before the Board under the circumstances of this case for the reasons set forth in the Hearing Transcript and the Final Report. Moreover, counsel of respondent's choosing was appointed (conditionally as to entitlement to compensation) by the April 21, 1992 Order of the Court, and such counsel represented respondent before the Board in connection with respondent's exceptions to the Board's draft report and has represented respondent thereafter before this Court.

7) There is no factual dispute, and there has been no offer of proof by respondent of a factual dispute, which could have altered the facts of record. There has been no showing of any facts which constitute arbitrary action by the Board or the Court. There is no showing of actual and substantial prejudice, and the failure of any such showing is dispositive of the issues of alleged denial of due process raised by respondent.

8) Based upon the undisputed facts in the record in this matter and, in particular

the Hearing Transcript and the Final Report, the Court finds that the record establishes by clear and convincing evidence that:

a) Respondent's conduct constitutes intentional violations of Canons 1, 7(A)(2), 7(A)(3), and 7(C) of the Delaware Judges' Code of Judicial Conduct.

b) Respondent's violations of the Delaware Judges' Code of Judicial Conduct constituted persistent and wilful misconduct as proscribed by Delaware Constitution, Art. IV § 37;

9) The Court rejects respondent's arguments that any or all of such canons are unconstitutionally vague or that the application of such canons to respondent's conduct violates any constitutional requirement, including the prohibition against vagueness or the impairment of the right to freedom of speech or expression.

10) Accordingly, it is appropriate and necessary that the Court impose sanctions on respondent. The Court is empowered to enter an Order imposing the sanctions of (a) removal from office; (b) retirement; (c) suspension; (d) cessation of all authority, rights, and privileges as a judicial officer; (e) declaration that a vacancy thereby exists in the judicial office previously held by respondent; (f) public censure; and (g) forfeiture of benefits, including restoration by respondent of any monies paid to respondent from March 31, 1992, to the date and time of removal.

11) The Court does not find on this record that there is clear and convincing evidence to support any forfeiture, including restorations of monies paid to respondent from March 31, 1992, to the date of this Order, in view of the unclear state of this record regarding respondent's vacation rights and the fact that he was ordered on April 1, 1992, by Family Court Chief Judge Poppiti not to "hear or decide any judicial matters or act in any judicial capacity whatsoever until the propriety of your political activity has been resolved."

12) Nevertheless, it is clear that Chief Judge Poppiti's powers and duties as the administrative head of the Family Court and the proper administration of justice authorize him to order that a judge who has been formally charged with extremely serious ethical charges, such as those presented in this case, not continue the adjudication of rights of litigants or participate in the important work of the courts while this Court determines the appropriate disposition of disciplinary matters before it relating to the conduct of the judge in question.

13) The Court finds that this record unequivocally reflects continuing behavior by the respondent which is unethical, deplorable, irresponsible, demeaning of a judicial office, and fails to observe and maintain the high standards of conduct required so that the integrity and independence of the judiciary may be preserved.

14) The Court finds that this record establishes by clear and convincing evidence that the ultimate sanctions and remedies of removal, cessation of authority, declaration of vacancy, and public censure are warranted and required.

NOW THEREFORE, IT IS HEREBY ORDERED pursuant to Delaware Constitution Art. IV, § 37 and Court on the Judiciary Rule 9(C)(5) as follows:

1. The Court finds that respondent intentionally violated Canons 1, 7(A)(2), 7(A)(3), and 7(C) of the Delaware Judges' Code of Judicial Conduct, and that such violation constitutes wilful and persistent misconduct as proscribed by Delaware Constitution Art. IV § 37.

2. Respondent is hereby removed from the office of Associate Judge of the Family Court of the State of Delaware, effective immediately upon entry of this Order.

3. Respondent shall cease all judicial activities immediately upon the entry of this Order.

4. A vacancy in the office formerly held by respondent is hereby deemed to exist.

5. Respondent is hereby censured for continuing behavior which is unethical, deplorable, irresponsible, demeaning of a judicial office, and fails to observe and maintain the high standards of conduct required so that the integrity and independence of the judiciary may be preserved.

6. Notwithstanding the foregoing sanctions, the Court does not intend to impose any forfeiture of entitlements which may have existed prior to the date and time of this Order.

7. Respondent's oral motion made after the conclusion of the April 29, 1992, hearing for a further hearing on the matters raised in such motion is hereby denied.*

8. A written opinion will follow hereafter.

9. This Order is hereby entered as of 12:00 noon, EDT, April 30, 1992.

10. A certified copy of this Order of Removal shall be transmitted forthwith by the Clerk of the Court on the Judiciary to the Governor, the State Treasurer, and the Chief Judge of the Family Court.

BY THE COURT:

/s/E. Norman Veasey
Chief Justice

APPENDIX B

IN THE COURT ON THE JUDICIARY
OF THE STATE OF DELAWARE

John R. Fisher, Director,

Administrative Office

of the Courts,

Plaintiff,

v.

James M. Thompson, Justice

of the Peace,

Defendant.

No. 1, 1973

ORDER

THIS 17th day of June 1974, after consideration of the report of the Board of Examining Officers, the briefs of counsel filed with the Board and the statements made at hearing on June 13, 1974, it appears to the Court as follows:

(1) The complaint against James M. Thompson, Justice of the Peace (defendant) has been properly processed under the Delaware Constitution, *Art. 4, § 37*, and the Rules of Procedure of the Court on the Judiciary.

(2) The report of the Board of Examining Officers, including findings of fact, conclusions of law and recommendations, was filed with the Clerk of this Court on May 30, 1974.

(3) Defendant did not file any exception to such findings, conclusions and recommendations and he made no objection thereto at the hearing.

(4) Shortly after August 19, 1973 defendant was suspended from sitting in any Justice of the Peace Court by the Chief Justice of the State of Delaware and has not performed any judicial services since the date of such suspension; he has continued to receive the salary of a Justice of the Peace.

(5) On or about October 24, 1973 the Chief Justice wrote to defendant stating that he was "requested to comply strictly with ... assignment of duties and work" made by the Deputy Administrator to the Chief Justice for the Justice of the Peace Courts. 10 *Del.C.* § 126, 127.

(6) Administrative duties were designated and a work schedule was assigned by the Deputy Administrator but defendant did not perform the duties or comply with the schedule. He has not performed any

---

* Judge Buckson personally addressed the Court after the conclusion of the hearing to make an application that the Honorable Andrew G.T. Moore, II, a member of this Court, be disqualified and that there be a further hearing on certain matters mentioned by Justice Moore in his questioning of respondent's counsel from the bench in the April 29, 1992, hearing. The Court notes that, since motions to disqualify are addressed to the judge or justice in the first instance, and Justice Moore entered an Order in the record on April 29, 1992, denying such motion to disqualify, no action by the entire Court is necessary or appropriate on such motion. With respect to respondent's motion for a further hearing on the matters to which respondent referred, such matters have formed no part of the decision of the Court and, therefore, there is no basis for any further proceedings.

services within the judicial system since September 28, 1973.

(7) Defendant's failure to comply with the order given by the Deputy Administrator was a wilful violation of a directive given by and under the authority of the Chief Justice, who is the "administrative head of all the Courts in the State ... [with] general administrative and supervisory powers over all the courts." *Art. 4, § 13.* Such failure to comply continued to the date of the report and, presumptively, to the date hereof.

(8) Wilful, persistent and prolonged failure by a judicial officer to comply with a lawful directive of the Chief Justice is a basis for removal from office under the provisions of *Art. 4, § 37.*

(9) The Court has the power to remove a judicial officer, *Art. 4, § 37,* and this includes the power to suspend such officer since that is merely a lesser form of punishment. *Burnap v. United States,* 252 U.S. 512, 40 S.Ct. 374, 64 L.Ed. 692 (1920); *Russo v. Walsh,* 18 N.J. 205, 113 A.2d 516 (1955); 63 *Am.Jur.*2d, Public Officers and Employees § 256; 67 *C.J.S.,* Officers § 58.

(10) Mitigating factors in the present case (including those stated in paragraph 34 of the report) make it appropriate to provide defendant with an opportunity to avoid removal by complying with the condition hereinafter stated.

(11) The period of time from suspension to the date hereof, approximately nine months, is substantial and during such period defendant has continued to receive his salary but has performed almost no services of any kind for the State. While delay in disposition has not been the fault of defendant, his refusal to perform continued throughout the period and he has benefited therefrom. The condition imposed below meets the ends of justice by providing for restoration of certain moneys to the State.

IT IS THEREFORE ORDERED as follows:

(1) The report of the Board of Examining Officers is confirmed and approved except as otherwise provided herein.

(2) Defendant shall, in accordance with the recommendation of the Board, forfeit all accumulated leave.

(3) Effective on the date hereof defendant is suspended, without salary or other compensation, from judicial office as a Justice of the Peace.

(4) Such suspension shall terminate if and when defendant pays to the State Treasurer the sum of $1,500 and files with the Clerk of this Court an affidavit of such payment, including the date thereof.

(5) If the sum specified in paragraph 4 above is not paid before 12 o'clock noon on July 17, 1974, defendant shall at that time be removed from the office of Justice of the Peace, all of his authority, rights and privileges as a judicial officer shall cease from that time and date and a vacancy shall be deemed to exist.

If the sum specified in paragraph 4 above is paid within the time fixed, this paragraph shall be null and void.

(6) This order shall be self-executing and no further order is required for termination of suspension or removal from office, as the case may be.

WILLIAM DUFFY
WILLIAM T. QUILLEN
ALBERT J. STIFTEL
WILLIAM MARVEL
GEORGE R. WRIGHT

### ADDENDUM

This case involved confusion in the circumstances surrounding the arrest, in processing the criminal charge against defendant (including the absence of a right to appeal because the fine was less than the constitutional minimum), in the preciseness of the directives given defendant by the Deputy Administrator for the Justice of the Peace Courts, in the procedural context in which the letter of the Chief Justice (paragraph 5 of the order) was written because the letter assumed that defendant would have a right to appeal to the Superior Court, and in the difficulty of adjusting defendant's work assignment with his other obligations. (His previous judicial assignments apparently had been so adjust-

ed.) In light of these factors, together with the balance of the record (including evidence of defendant's good character), it is the view of the Court that these proceedings should be concluded with as little effect as possible on defendant's community, occupational and professional standing. There is no reason to believe that defendant will be other than a good citizen and professionally capable and it is the Court's view that, notwithstanding these proceedings, he should be given full opportunity to progress to the full extent of his ability. But simple fairness requires that defendant make adjustment for that portion of the disobedience and inequities which are reasonably attributable to fault on his part.